```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/6/12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LILIAN CASTILLA                                        :
                                                       :
                        Plaintiff,                     :
                                                       :          09 Civ. 5446 (SHS)
        -against-                                      :
                                                       :          Opinion
CITY OF NEW YORK, NEW YORK CITY                        :
POLICE DETECTIVE OSCAR SANDINO,                        :
TAX ID #919673 INDIVIDUALLY AND AS                     :
A DETECTIVE OF NEW YORK CITY POLICE                    :
DEPARTMENT, AND POLICE OFFICERS                        :
JOHN DOE OFFICERS 1-10                                 :
                                                       :
                        Defendants.                    :
------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

Plaintiff Lilian Castilla brings this civil rights action pursuant 42 U.S.C. §§ 1983 and 1985 against defendants the City of New York, police detective Oscar Sandino, and John Doe police officers. She alleges that Sandino, with the assistance of the John Doe police officers, sexually assaulted and repeatedly threatened her in violation of the United States Constitution. The City has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on the grounds that plaintiff fails to state a viable claim for municipal liability and that she cannot maintain any state law claims against any defendants. Because Castilla specifically states that she is not asserting any state claims, (see Pl.'s Mem. in Opp. at 15), there is no need to dismiss any such claims. However, plaintiff has stated plausible claims for municipal liability against the City; accordingly, the City's motion for judgment on the pleadings is denied.

1

**Exhibit A**

## I. BACKGROUND

Unless otherwise noted, the following facts are drawn from the Amended Complaint and presumed true for purposes of this motion.

On February 16, 2008, New York Police Department ("NYPD") detective Oscar Sandino and other members of the NYPD entered Castilla's apartment to execute a search warrant. (Am. Compl. ¶ 14.) Sandino followed Castilla into a bedroom and then demanded that she strip for him. (*Id.* ¶¶ 14-16.) Castilla complied with his demand. (*Id.* ¶ 17.) After questioning Castilla about her boyfriend and his drug activities and threatening her with the loss of custody of her children, detective Sandino directed that Castilla and her boyfriend be taken to the police precinct in separate cars. (*Id.* ¶¶ 20-21.)

According to Castilla, Sandino and another officer drove her around Queens, continuing to threaten her with the loss of custody of her children. (*Id.* ¶¶ 22-26.) The other officer eventually got out of the vehicle, at which point Sandino asked Castilla what she was willing to do to keep her kids and if she was willing to be "bedded." (*Id.* ¶¶ 27-30.) Sandino ultimately left the vehicle, and two other detectives drove Castilla to the NYPD's 110th Precinct, where she was held for an hour or two. (*Id.* ¶¶ 32-33.)

At the precinct, Sandino brought Castilla into an interrogation room. (*Id.* ¶ 35.) While alone with her there, Sandino asked her answer to his earlier sexual proposition. She demurred, and he again threatened to take away her kids and also threatened physical violence. (*Id.* ¶¶ 43-47.) At one point, another detective entered the interrogation room. (*Id.* ¶ 38.) Sandino and this other detective attempted to recruit Castilla as a confidential informant by using threats

2

against her children and referring to a potential "deal" between Castilla and Sandino. (*Id.* ¶¶ 38-40.)

Castilla asked to use the bathroom and Sandino took her there. He allegedly followed her into the bathroom, displayed his gun, ordered her to undress, and molested and sodomized her in a stall. (*Id.* ¶¶ 49-55.) Another officer allegedly helped Sandino isolate Castilla in the bathroom and remained in the immediate vicinity of the bathroom while Castilla was in there with Sandino. (*Id.* ¶¶ 50, 56.) None of the individual defendants present at the precinct asked why Sandino was alone with Castilla in the interrogation room or in the bathroom, and none of them reported Sandino's activity to superiors. (*Id.* ¶¶ 57-59.)

Following this incident at the precinct, according to the complaint, Sandino repeatedly called and texted Castilla in order to arrange additional sexual encounters. (*Id.* ¶¶ 61-69.) He continued to contact her even after her boyfriend's defense attorney asked him not to do so. (*Id.* ¶¶ 72-74.) Sandino also allegedly called Castilla's brother to threaten removal of her children if she did not return his calls. (*Id.* ¶¶ 75-78.) Moreover, when an Administration for Children's Services caseworker was interviewing Castilla at her parents' apartment on February 19, 2008, Sandino and another officer showed up. (*Id.* ¶ 80.) Sandino took Castilla into a room and tried to intimidate her into staying silent about the sexual relationship he was pursuing with her. (*Id.* ¶¶ 83-87.)

In March 2008, Castilla met with the NYPD Internal Affairs Bureau (the "IAB") and provided recordings of calls Sandino had made to her and copies of text messages he had sent her. (*Id.* ¶ 88.) The IAB gave her a recording wire for a meeting with Sandino, which took place on March 11, 2008. (*Id.* ¶ 89.) At their meeting, Sandino was apparently suspicious of

3

Castilla and made threats. (*Id.* ¶ 90.) Castilla was so frightened by Sandino that the IAB "whisked her away." (*Id.* ¶ 91.)

According to Castilla, the individual defendants who acted in concert with Sandino continue to work for the NYPD and have not faced any charges as a result of their misconduct. (*Id.* ¶ 92.) Castilla also alleges that the individual defendants conspired to obstruct and cover up any investigation of her claims. (*Id.* ¶¶ 95-99.)

Castilla commenced this action in 2009. She brings various civil rights claims against individual officers and municipal liability claims against the City. The municipal liability claims are the subject of this motion.

Castilla specifically alleges that the City has a "policy and practice which provides practically unimpeded control over female suspects and prospective female confidential informants, and which fails to explicitly prohibit the use of sexual dominance and gender exploitative control tactics that seek to further investigative ends and individual officer[s'] personal prurient desire[s]." (*Id.* ¶ 12.) She further alleges inadequate training, supervision, and discipline of officers, as well as a deeply ingrained "code of silence" regarding police misconduct of this type. (*Id.* ¶¶ 126-129.) As a result of these policies and practices, the City has allegedly "exhibit[ed] deliberate indifference to the constitutional rights of its citizens." (*Id.* ¶ 125.)

Moreover, according to Castilla, the City "has been on notice of a significant and pervasive problem of police officers' use of their position and power to abuse female suspects, prospective confidential informants, and confidential informants." (*Id.* ¶ 100.) In particular, she claims that "defendant Sandino had prior incidences of sexual abuse against females within his custody and control." (*Id.* ¶ 13.) She also refers to various news reports of incidents

4

involving other police officers who isolated females and then sexually assaulted them while they were in the custody or control of those officers. (*Id.* ¶¶ 105-06, 109.)

In addition, the Court takes judicial notice of the fact that Sandino pled guilty to two counts of deprivation of civil rights, one of which arose from events that Castilla has alleged in this complaint, at least as far as Sandino's own activities are concerned. In May of this year, Sandino was sentenced by a federal judge principally to 24 months' imprisonment for those crimes. (*See* Judgment in *United States v. Sandino*, Cr. 10-331 (E.D.N.Y. May 19, 2010).)

As noted above, the City now moves for judgment on the pleadings pursuant to Rule 12(c) on the ground that Castilla has failed to state a claim for municipal liability.

## II. DISCUSSION

### A. Legal Standard

In deciding a motion under Rule 12(c), courts apply the same standard that applies on a motion to dismiss a claim for relief pursuant to Rule 12(b)(6). *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999). Accordingly, a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir.2006). A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).

B. Municipal Liability

To sustain a claim for relief pursuant to section 1983 against a municipal defendant, a plaintiff must show (1) the existence of an officially adopted policy or custom and (2) a causal connection between the custom or policy and the deprivation of a constitutional right. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992).

A plaintiff may demonstrate the existence of a policy or custom in a variety of ways. First, she may provide evidence of a formal policy officially adopted by the municipality. *Monell*, 436 U.S. at 690. Second, a single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered a policy and thus subject a municipality to liability. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404-06 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986). Third, a policy may be established by showing that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware. *Brown*, 520 U.S. at 403-04; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Monell*, 436 U.S. at 690-91. Fourth, where a municipality's failure to provide adequate training or supervision of its agents rises to the level of deliberate indifference, section 1983 liability may lie against the municipality. *Brown*, 520 U.S. at 407; *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Cash v. Cnty. of Erie*, 09-4371, 2011 WL 3625093, at *7 (2d Cir. Aug. 18, 2011). However, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

6

C. Application

Castilla does not claim that the City's liability pursuant to *Monell* and its offspring arises from a formal City policy or an unconstitutional act by an authorized decision-maker. Rather, she alleges, under the third and fourth theories, a widespread custom of at least tolerating male police officers' sexual misconduct, and a failure to train, supervise, and/or discipline male police officers in connection with their handling female detainees and informants. Taking plaintiffs' allegations as true, the Court finds that Castilla has sufficiently pled claims for *Monell* liability against the City of New York.

This finding is based, in part, on the Second Circuit's recognition that "[it] is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004). The Second Circuit has not yet addressed whether *Iqbal* has heightened the pleading requirements for such a municipal liability claim, but district courts in this Circuit have continued, post-*Iqbal*, to apply the pleading standard articulated in *Amnesty* to a *Monell* claim based on a failure to train. *See Ferrari v. Cnty. of Suffolk*, No. 10 Civ. 4218, 2011 WL 2297125, at *9 (E.D.N.Y. Jun. 7, 2011); *Williams v. City of New York*, 690 F. Supp. 2d 338, 346 (S.D.N.Y. 2010); *Michael v. County of Nassau*, No. 09 Civ. 5200, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010). Thus, in assessing the sufficiency of plaintiff's *Monell* claims—particularly the failure to train claim—the Court keeps in mind that plaintiff has not yet had the full benefit of discovery.

The City's position cannot be ignored. The City contends that this case simply concerns an isolated incident involving a single rogue police detective. The City may be right.

7

However, the alleged facts, taken as true for purposes of this motion, plausibly suggest otherwise. Plaintiff alleges that multiple detectives and officers helped Sandino threaten, abuse, and sexually assault Castilla over many hours and in many locations, including at a police precinct. The complaint specifically alleges concerted action by other police officers in addition to Sandino who were not supervised and at least not immediately stopped or disciplined. Sandino is alleged to have continued for weeks after the assault to contact, proposition, and threaten Castilla. When Sandino paid Castilla a visit at her family's home, Sandino was accompanied by another officer. Furthermore, Castilla alleges that the police officers maintained a "code of silence" to cover up their misconduct.

In *Michael v. County of Nassau*, the U.S. district court in the Eastern District of New York found, on a motion to dismiss decided under *Iqbal*, that an informal custom "of at least tolerating police misconduct" and/or a failure to properly train police officers could be inferred where the alleged conduct took place over several hours, including at police headquarters, and several officers participated in the repeated denials of the plaintiff's rights. 2010 WL 3237143, at *4. Castilla, like the plaintiff in the *Michael* case, alleges a string of incidents in which she was repeatedly victimized by multiple officers in multiple locations, both on and off City property.

More than that, Castilla alleges various other instances of male police officers taking sexual advantage of females under their custody or control. In *Ferrari v. County of Suffolk*, which was decided after *Iqbal*, the court allowed a *Monell* claim to survive a motion to dismiss in light of allegations of two instances of unconstitutional conduct in addition to plaintiff's own claim. 2011 WL 2297125, at *9. *See also Colon v. City of New York*, Nos. 09 Civ. 8-9, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009); *cf. Cash*, 2011 WL 3625093 at *9 (finding that

8

a jury could reasonably conclude that a single prior complaint of sexual exploitation, in light of prison guards' duty to protect prisoners, could put a municipality on notice that its existing policy was insufficient to deter such misconduct). Although the City challenges the admissibility of the evidence plaintiff cites as relevant examples of police misconduct, the Court need not decide that issue at this time.

Finally, the City argues that plaintiffs' allegations do not demonstrate an unconstitutional policy or custom, but rather show the opposite: a readiness on the part of the City to investigate and discipline police officers who misbehave. In particular, the City points to the IAB's responsiveness to Castilla's IAB complaint and the fact that Sandino was ultimately punished for his wrongdoing. While these facts inure to the City's benefit on this motion, Castilla also alleges that not all the individual perpetrators have been investigated and disciplined. In any event, the issue of whether the City eventually investigates and disciplines employees accused of misconduct is distinct from whether the City was deliberately indifferent to the violation of citizens' constitutional rights in the first place. In other words, even if the City took corrective action, its training and supervision of male officers vis-à-vis female detainees and informants still may have been inadequate.

The Court is not evaluating the ultimate merits of plaintiff's *Monell* claims here. The Court is simply finding that the allegations of very serious police misconduct, supported by adequate facts, raise an inference of municipal liability that is plausible enough to permit the claims to proceed.

### III.  CONCLUSION

Accordingly, for the reasons set forth above, the City's motion for judgment on the pleadings with respect to Castilla's claims against the City is denied. Plaintiff is entitled to

9

discovery regarding the City's policies and practices regarding training, supervision, and discipline in connection with male officers' handling of female suspects, prospective confidential informants, and informants.

Dated: New York, New York
August 22, 2011

Sidney H. Stein, U.S.D.J.

Taylor v. RED Development, LLC, 083111 KSDC, 11-2178-JWL
**Michelle Taylor et al., Plaintiffs,**
**v.**
**RED Development, LLC d/b/a The Legends at Village West et al., Defendants.**
**No. 11-2178-JWL**
**United States District Court, District of Kansas**
**August 31, 2011**
**MEMORANDUM & ORDER**

John W. Lungstrum, United States District Judge.

Plaintiffs, four family members who are African-American, filed this lawsuit alleging that, on the basis of their race and in violation of their constitutional rights, they were unlawfully detained for allegedly shoplifting during an April 1, 2009 visit to a retail shopping center in Kansas City, Kansas. Plaintiffs assert claims pursuant to 42 U.S.C. §§ 1981 and 1983 as well as a state law claim of false arrest/imprisonment against various defendants, including the retail shopping center; a company that provides security services at the shopping center; two security officers; the Unified Government of Wyandotte County/ Kansas City, Kansas; and two police officers. This matter is presently before the court on the Unified Government's motion to dismiss plaintiffs' complaint pursuant to Rule 12(b)(6) (doc. 7). As will be explained, the motion to dismiss is denied.

In Count 2 of their complaint, plaintiffs assert a section 1983 claim against the Unified Government based on the acts of two police officers employed by the Unified Government. To prevail on a section 1983 claim against a municipality, a plaintiff must show both the existence of a municipal policy or custom and a direct casual link between the policy or custom and the injury alleged. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions–and the basis for them–of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from "deliberate indifference" to the injuries that may be caused. *Id.* (quotations and alterations omitted). In support of their claim that the Unified Government is liable for the acts of its police officers, plaintiffs allege in their complaint that the police department of the Unified Government has

adopted or approved of policies and practices which directed, encouraged or permitted its police officers to target African American customers at shopping centers and business establishments within the boundaries of UG, stop and detain African American customers, without probable cause, or any legitimate cause at all, in violation of their rights under the Fourth Amendment of the United States [Constitution] and interrogate them as to whether they committed shoplifting at the particular business establishment. UG adopted or approved of a policy and practice of stopping, detaining, interrogating and arresting African American customers solely upon the report and

# Exhibit B

representation of a merchant that an African American customer committed shop lifting at the merchant establishment without any independent investigation, interview of witnesses or investigation of any kind by the dispatched police officer to ascertain the basis and truth of the merchant's accusation.

Plaintiffs also allege that the Unified Government and officials of the police department "recklessly failed to adequately supervise, train, and discipline UG's police officers in such a manner and to such a degree to prevent their officers from stopping and detaining African American citizens without probable cause in violation of their constitutional rights."

The Unified Government moves to dismiss plaintiffs' section 1983 claim on the grounds that claim fails to comply with the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure as articulated by the Supreme Court in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, ___ U.S.___, 129 S.Ct. 1937 (2009). Specifically, the Unified Government contends that plaintiffs' allegations of municipal liability amount to no more than a "formulaic recitation of the elements" without any factual allegations sufficient to give rise to an inference that the officers at the scene were following a policy or custom of detaining African American shoppers without probable cause. The Unified Government further contends that plaintiffs' complaint contains no support for the assertion that the Unified Government recklessly failed to adequately supervise, train and discipline its officers. In essence, the Unified Government urges that the complaint must be dismissed because it focuses solely on the April 1, 2009 incident without factual allegations showing a pattern of similar constitutional violations sufficient to give rise to an inference that a municipal policy caused the alleged violations in this case.

In response, plaintiffs urge that the allegations in their complaint easily satisfy the requirements for pleading a claim of municipal liability under Rule 8(a)(2) as articulated by the Supreme Court in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993). In *Leatherman*, the Supreme Court rejected a heightened pleading standard for section 1983 claims against municipalities and reaffirmed that "all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 168 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

*Leatherman*, however, pre-dates *Iqbal* and *Twombly*–the cases relied upon by the Unified Government in support of its motion. As explained by the Supreme Court in these cases, the Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Under *Iqbal*, the key issue in analyzing a motion to dismiss is whether the well-pleaded allegations of the complaint "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1950. Dismissal is not appropriate where the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). A claim has facial plausibility when the plaintiff pleads factual content, as opposed to legal conclusions, that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 129 S.Ct. at 1949.

Although no Circuit Court of Appeals has squarely addressed the appropriate pleading standard for municipal liability in the wake of *Iqbal* and *Twombly*, many district courts have done so with varying results. As recently summarized by Judge Ellison of the Southern District of Texas, some courts have continued to allow "generic or boilerplate assertions" of the grounds for municipal liability pursuant to *Leatherman* while "[o]ther courts have treated *Twombly* and *Iqbal* as dramatically altering the pleading requirements for municipal liability claims" such that bare allegations are no longer sufficient. *Thomas v. City of Galveston, Texas*, ___ F.Supp.2d ___, 2011 WL 3290317, at *13 (S.D. Tex. Aug. 1, 2011) (collecting cases). In *City of Galveston*, the district court persuasively concluded that "*Leatherman* and *Iqbal* may be reconciled, without allowing boilerplate allegations, on the one hand, or requiring plaintiffs to plead specific factual details to which they do not have access before discovery, on the other." *Id.* at *14. As reasoned by the court in that case:

*Iqbal* instructed that "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 129 S.Ct. at 1950. In the context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery. Accordingly, only minimal factual allegations should be required at the motion to dismiss stage. Moreover, those allegations need not specifically state what the policy is, as the plaintiff will generally not have access to it, but may be more general. . . .Still, a plaintiff suing a municipality must provide fair notice to the defendant, and this requires more than generically restating the elements of municipal liability. Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy. Those types of details, or any other minimal elaboration a plaintiff can provide, help to "satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests, " *Twombly*, 550 U.S. at 555 n.3, and also to "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 129 S.Ct. at 1950.This balance, requiring more than boilerplate allegations but not demanding specific facts that prove the existence of a policy, is in line with the approach of other courts post-*Iqbal*. Where a plaintiff provides more than a boilerplate recitation of the grounds for municipal liability, and instead makes some additional allegation to put the municipality on fair notice of the grounds for which it is being sued, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman*, 507 U.S. at 168–69.

*Id.* at *14-15 (footnotes omitted).

Applying the well-reasoned approach adopted by the court in *City of Galveston*, the court concludes that plaintiffs' allegations in this case satisfy the pleading requirements for municipal

liability under *Leatherman* as refined by *Iqbal*. Significantly, plaintiffs here have done more than simply allege that the individual officers' conduct conformed to official policy or practice; rather, they have identified a specific practice to which the officers' conduct allegedly conformed–namely, the purposeful targeting and detention of African-American shoppers despite the absence of probable cause to believe that such shoppers engaged in shoplifting activities. While it is true that plaintiffs do not include in their complaint additional instances of officers targeting African-American shoppers without probable cause, that omission is not fatal under *Iqbal* because it is unlikely that plaintiffs would have access to such information at the pleading stage. *See Williams v. City of New York*, 690 F.Supp.2d 338, 344 (S.D.N.Y. 2010) (it is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage); *Mitchell v. Township of Pemberton*, 2010 WL 2540466, at *6 (D.N.J. June 17, 2010) ("[I]nformation concerning a town's customs or policies, the policymakers' motivations behind such policies, or the facts surrounding police department customs, are typically unavailable to an outsider, so that pleading facts to sufficiently advance a racial profiling claim may be impossible without some assistance through litigation tools such as request for admissions, interrogatories, document requests, and depositions."); *Wilson v. City of Chicago*, 2009 WL 3242300, at *3 (N.D. Ill. Oct. 7, 2009) ("It is not reasonable to expect a plaintiff to have information about other incidents at the pleading stage; instead, a plaintiff should be given the opportunity to develop an evidentiary record to determine whether he can provide support for his claims.").

In sum, the court concludes that the allegations in plaintiffs' complaint concerning municipal liability provide fair notice to the Unified Government of the nature of the claim and the grounds on which the claim rests. The allegations also plausibly give rise to an entitlement to relief. No more is required under *Iqbal* and *Twombly*. The Unified Government's motion to dismiss is denied.

IT IS THEREFORE ORDERED BY THE COURT THAT the Unified Government's motion to dismiss plaintiffs' complaint pursuant to Rule 12(b)(6) (doc. 7) is denied.

IT IS SO ORDERED.

This is a printer-friendly version of an article from www.theday.com or www.zip06.com.
To print this article open the file menu and choose Print.

Back

Article published Oct 23, 2012

# New London police union says crime on the rise; administration disagrees

By Kathleen Edgecomb Day Staff Writer

**Community policing model of chief at issue**

**New London** - The president of the police union said Monday that crime is up in the city and staffing shortages are jeopardizing public safety.

But the police administration cited Uniform Crime Report statistics that show serious crime is going down. In 2011 there were 7,841 crimes reported in the city and for the first nine months of the year, 5,267 crimes were reported, according to Capt. Brian Wright. That projects to slightly more than 7,000 crimes reported for the year.

"I've heard downtown isn't safe and violent crime is way up. ... The numbers are not showing what I'm hearing," Police Chief Margaret Ackley said during a two-hour City Council Public Safety Committee meeting at City Hall.

Councilor Wade Hyslop, chairman of the committee, brought before the committee the police chief and her entire administration - three captains and the deputy chief; along with Union President Todd Lynch and Mayor Daryl Justin Finizio to discuss a spate of violent crimes that have occurred over the past six months and to address concerns that there are not enough police to properly patrol the city.

The meeting was recessed without any action taken but will reconvene at 5 p.m. next Monday to continue the discussion.

Hyslop said the meeting was helpful in that all sides voiced their opinions and the councilors were able to hear firsthand comments from the union and the administration.

"I think we need a concentrated effort by the council, the mayor and police department to work together," Hyslop said after the meeting. "We need people to understand we are all working together on public safety."

The community also has a responsibility to help keep the streets safe by reporting criminal behavior, he added.

Lynch sent a letter to the mayor in September and quoted headlines from the newspaper and a readership poll from an online news organization saying the data "paints a troubling picture" of crime in the city.

On Monday, Lynch said there is a disconnect between the administration and rank-and-file who feel they are being penalized for trying to prevent crime. Officers would like to go back to a pro-active type of policing he said, as opposed to a community policing model the chief has implemented.

"The men and women of this department do not feel they can go out and police the community," Lynch said. "And I stand by that statement."

He added that problems in the administration are compelling officers to leave the department.

"People are leaving the city left and right," Lynch said. "It does seem they (the administration) aren't looking for solutions to the problems."

According to Lynch, 27 officers have left the department since July 2009 when Ackley became chief. Those leaving the department include seven retirements, including two long-serving captains; the contract for the deputy chief was not renewed; three officers were

**Exhibit C**

forced to resign or quit; and 12 made so-called lateral moves, meaning they left to work in another police department.

During that same time period - July 2009 to the present - the city hired 17 new officers, replaced the deputy chief and promoted two captains from within its ranks.

The department now has 80 sworn officers, down from a high of 95 two years ago. Although the 2012-13 budget left 10 positions vacant, there is still $250,000 to hire new officers. But bringing on new hires can take several months for a transfer from another department, to more than a year for a brand new officer who has to go through the police training academy.

Capt. Steven Crowley said some have left because they feared they would lose their jobs. During the city's contentious budget debate, 10 officers received layoff notices but all the layoffs were eventually rescinded.

Capt. Todd Bergeson said he is working on better scheduling to save overtime costs, sometimes foregoing filling an empty slot on a slow day so he can bring in extra officers during a busy weekend.

Also in an effort to control costs and maximize manpower, Deputy Chief Peter Reichard changed the scheduling matrix to have more officers on during busy times when they can be deployed to high-crime areas.

"I didn't expect miracles out of this meeting, but I think it's healthy to get everyone's comments on the record all at once and all together," Council President Michael Passero near the end of the meeting. "I'm leaving feeling we are headed in the right direction."

k.edgecomb@theday.com