# EXHIBIT A

2012 WL 4804862
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

David Glenn BROWN, Plaintiff,
v.
CONTRA COSTA COUNTY, et al., Defendants.

No. C 12−1923 PJH.   |   Oct. 9, 2012.

**Attorneys and Law Firms**

David Glen Brown, Fairfield, CA, pro se.

James Mapanao Marzan, Peter Pratt Edrington, Edrington Schirmer & Murphy LLP, Pleasant Hill, CA, for Defendants.

**Opinion**

### ORDER GRANTING MOTION TO DISMISS

PHYLLIS J. HAMILTON, District Judge.

**\*1** Before the court is defendants' motion to dismiss the complaint for failure to state a claim. Having read the parties' papers and carefully considered their arguments, and good cause appearing, the court hereby GRANTS the motion as follows.

### BACKGROUND

This is a case alleging discrimination and hostile work environment, filed by plaintiff David Glenn Brown. Defendants are Contra Costa County; Mark Peterson ("Peterson"), the elected District Attorney of Contra Costa County; and two Contra Costa County Deputy District Attorneys––Karen Zelis Holder ("Holder"), and Douglas C. MacMaster ("MacMaster").

Plaintiff, who is African–American, was employed as a Deputy District Attorney for Contra Costa County beginning in July 1986, and continuing until the date he asserts he was constructively discharged. In the first amended complaint ("FAC"), plaintiff alleges that over the years he performed his job well, and received numerous promotions.

From March 2004 until January 2011, plaintiff was the Senior Deputy District Attorney in charge of the Richmond Branch of the Contra Costa County District Attorney's Office ("D.A.'s Office"). According to plaintiff, running a branch office is considered "prestigious," but "difficult." FAC ¶ 14. Plaintiff asserts that his ascension to the top ranks of the D.A.'s Office was not without difficulty, because "[i]t is well-known that there is an undercurrent of racism in the criminal justice system, and Contra Costa County has been considered by some as exemplary of that bias." FAC ¶ 15. He claims that some people refer to Contra Costa County as "KKK County." *Id.* He also alleges that he "has long been aware that some in the criminal justice community are biased against him because of his race," but asserts that "until recently, he had always been able to overcome these prejudices through his abilities and achievements." *Id.*

Plaintiff recounts two incidents that occurred at the D.A.'s Office that reflect this allegedly racist environment. In the first incident, which occurred in 2002, MacMaster allegedly interrupted a conversation between plaintiff and a co-worker by stating, "Brown [referring to plaintiff] would be asking 'where da white women at?' " in an exaggerated "ghetto accent." Plaintiff

asserts that he filed a complaint against MacMaster for this inappropriate remark, and believes that MacMaster "holds a grudge" against him for this. FAC ¶¶ 16, 18. In the second incident, plaintiff alleges on "information and belief" that Holder (who is herself African–American) instructed junior attorneys in a training session to kick off African American jurors and to commit other unethical acts in presenting a case. FAC ¶ 17.

In 2010, there was an election for District Attorney of Contra Costa County. The candidates were defendant Peterson, and a private attorney named Dan O'Malley. Plaintiff supported Dan O'Malley and contributed to his campaign. FAC ¶¶ 20–21. Holder and MacMaster supported Peterson. FAC ¶ 22. Plaintiff asserts that the election was "hotly contested," and that the Peterson supporters in the D.A.'s Office took the position that it was "disloyal" to support an "outsider" like O'Malley, to the extent that one Peterson supporter—Harold Jewett—allegedly punched an O'Malley supporter in the eye, causing severe damage. FAC ¶ 21.

**\*2** Plaintiff also asserts that Holder and MacMaster "made it clear during the months prior to the election that anyone who did not back [Peterson] would suffer if Peterson was elected." FAC ¶ 22. According to plaintiff, Holder made statements to the effect that she wanted to be present after the election to watch Peterson demote plaintiff. FAC ¶ 23.

Plaintiff alleges that as a result of these "threats," he became concerned about his future employment with the D.A.'s Office, and began to scale back his financial support of O'Malley (even though he believed O'Malley was the better candidate). However, he did not actually switch his allegiance to Peterson. FAC ¶ 24.

Peterson won the election in November 2010. Plaintiff alleges that in December 2011, [1] Peterson demoted him "in a gratuitously humiliating and degrading fashion." Plaintiff asserts that while no reason was given for the demotion, "it was clearly in retaliation for [his] exercise of his First Amendment rights to support the candidate of his choice." FAC ¶ 25. Moreover, plaintiff alleges, Peterson "invited Holder to watch as [p]laintiff was demoted"—despite the fact that Holder was not a supervisor and therefore had no reason to be there—"thus making good on Holder's pre-election desire." *Id.* He does not provide any specific details of this alleged demotion, or what he means by asserting that Peterson "invited Holder to watch"—but he is apparently referring to the fact that Peterson removed him from the position of Senior Deputy District Attorney in charged of running the Richmond Branch of the D.A.'s Office.

Following this "demotion," plaintiff was assigned to work in the Mental Health Unit, a position that plaintiff claims is "isolated" and "only quasi-criminal," and is considered "a post in 'Siberia' for attorneys who are being punished." FAC ¶ 26. Plaintiff alleges that when he arrived at the Mental Health Unit, he discovered that it was totally disorganized and "in complete disarray." FAC ¶ 27. Tom Kensok, the Deputy who had previously been in charge of the Mental Health Unit, had been a Peterson supporter, and was transferred from the Unit to become a Senior Deputy District Attorney and Peterson's "right-hand man." *Id.* Plaintiff then proceeded to begin trying to "straighten[ ] out the legal mess" that Kensok had allegedly left behind. FAC ¶ 28.

Plaintiff asserts that in March of 2011, while he was working in the Mental Health Unit, MacMaster (now a Senior Deputy District Attorney and Peterson's Chief Deputy) sent an e-mail to a third party stating that he was "amazed" that plaintiff was able to do simple legal research. Plaintiff claims that "[i]n view of the animus previously expressed by MacMaster," he "believed that a hostile work environment was being created." Accordingly, he complained to Peterson. FAC ¶ 29.

Plaintiff asserts that Peterson responded by appointing MacMaster's best friend in the office to investigate the complaint, and that "[i]t goes without saying that nothing came of the investigation." FAC ¶ 30.

**\*3** Next, plaintiff alleges, just as he was beginning to achieve some success with matters in the Mental Health Unit, Peterson transferred him to the Juvenile Unit, to a nonsupervisory position. According to plaintiff, this position offered no possibility of trial work, and was one that was generally held by inexperienced, junior attorneys. FAC ¶ 31. According to plaintiff, Peterson's "retaliation plan" was now nearly complete—in six months, plaintiff had gone from serving as a Senior Deputy District Attorney running a significant branch office, to serving in a position typically held by a first-or second-year attorney. *Id.*

Brown v. Contra Costa County, Slip Copy (2012)

Plaintiff asserts that MacMaster told him that the reason for this latest transfer was that plaintiff was "unhappy in the mental health assignment," which (according to plaintiff) MacMaster knew was a false and pretextual statement. In fact, plaintiff asserts, he had been enjoying recent success in the Mental Health Unit and had been attending training to learn the "specialized quasi-criminal aspects of the law with respect to mental health cases," and had completely turned the office around, eliminating the "disarray." FAC ¶ 32.

Plaintiff alleges that to make matters worse, a junior attorney was told she would have to go to the Juvenile Unit because plaintiff would not take the position seriously. FAC ¶ 33. Plaintiff asserts further that in June 2011, he was speaking with a junior co-worker when he was approached by now-Senior Deputy District Attorney Harold Jewett (the person who had punched the O'Malley supporter prior to the election) who told the junior attorney, "Don't listen to anything he (plaintiff) has to say." FAC ¶ 34.

Plaintiff asserts that on July 11, 2011, the day before beginning his assignment in the Juvenile Unit, he requested a meeting with Dan Cabral, the supervisor in charge of the Unit and someone that plaintiff had considered a long-time friend. FAC ¶ 35. At the meeting, Cabral said that his supervisors had warned him about plaintiff, although he would not repeat what he had been told (claiming that he did not recall). Plaintiff told Cabral he did not like being lied to, and left the meeting. FAC ¶ 36.

Plaintiff was then summoned to a meeting with MacMaster. At that meeting, according to plaintiff, MacMaster and Cabral accused him of being insubordinate and unprofessional for walking out of the earlier meeting with Cabral, and demanded that he sign a disciplinary letter. When plaintiff refused to do so, they allegedly told him he was not free to leave, and then accused him of failing to attend another meeting, which plaintiff claims he had in fact attended. Plaintiff asserts that "[i]t became clear to [him] that he was being set up for termination" and that Peterson, MacMaster, and others were "willing to lie in order to manufacture 'grounds' to do so." FAC ¶ 37.

Following these events, plaintiff asserts, he "was forced to take time off from work," and he "subsequently went out on stress leave and has not returned." Nevertheless, plaintiff claims, "the pattern of harassing conduct continued." FAC ¶ 38.

*4 In December 2011, a clerk that plaintiff had formerly supervised at the Richmond Office asked him to testify on her behalf at a Merit Board Hearing. However, Holder allegedly "announced to the tribunal" that plaintiff should not be permitted to testify, by revealing that he was out on sick leave—which plaintiff claims was a violation of County policy. FAC ¶ 38. Plaintiff also claims that Holder said that plaintiff had a lawsuit pending against the County, which plaintiff asserts was not true. Id. [2]

Plaintiff filed the original complaint in this action on April 18, 2012, using one of the court's Title VII form complaints. At that time he alleged unlawful termination, and the following:

> Ongoing pattern of harassment and retaliation making it impossible to perform my job duties. Making disparaging remarks about my job performance and ability. Making false statements about my job performance to those in and outside the office. Demoting and transferring [p]laintiff for political personal and discriminatory purpose.

Plaintiff asserted that the conduct of defendants was discriminatory with respect to his race or color, and as to "political conduct."

He also alleged that he had received a right-to-sue letter from the EEOC on February 12, 2012. However, the EEOC letter that was attached to the complaint was dated February 23, 2012, and stated that the Commission had received plaintiff's request for a right-to-sue letter, and that it had terminated the investigation and forwarded plaintiff's request to the DOJ for issuance. No actual right-to-sue letter was attached. Thus, the clerk issued a deficiency notice, indicating that plaintiff needed to submit the notice of right to sue. The EEOC did issue a right-to-sue letter on April 18, 2012, and plaintiff presumably received it shortly after that date.

Brown v. Contra Costa County, Slip Copy (2012)

In May 2012, plaintiff allegedly had a face-to-face meeting with Peterson, to discuss his future with the D.A.'s Office. Plaintiff alleges that he asked to be placed on paid administrative leave, as that was how Peterson had handled the case of another attorney in the office who had been "undeniably confronted with a hostile work environment." However, Peterson allegedly denied the request on the basis that plaintiff was already on medical leave. FAC ¶ 39.

On May 16, 2012, plaintiff submitted an "amended complaint" with a copy of the right-to-sue letter (dated April 18, 2012) attached. This "amended complaint" asserted claims under Title VII; 42 U.S.C. §§ 1983 and 1981; and the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. This "amended complaint" was stamped "received" by the Clerk's Office, but was not filed.

On May 21, 2012, plaintiff filed another "amended complaint," to which he also attached a copy of the April 18, 2012 right-to-sue letter. On June 11, 2012, Magistrate Judge Corley, to whom the case was then assigned, issued an order indicating that since Rule 15 authorizes a plaintiff to file only one amended complaint as of right, the court would disregard the May 16, 2012 "amended complaint" and would authorize the filing of the more recent May 21, 2012 "amended complaint." For this reason, this order refers to the May 21, 2012 "amended complaint" as the "first amended complaint" or "FAC."

*5 Plaintiff asserts four causes of action in the FAC. In the first cause of action, plaintiff alleges "racial discrimination" in violation of 42 U.S.C. § 1981 and § 1983, against the individual defendants. He also mentions the right to "work in a workplace free from racial harassment, hostile work environment, racial discrimination and retaliation," FAC ¶ 42, but it is not clear whether he is asserting all those as bases for the claim. He then asserts that the individual defendants deprived him of his "rights, privileges and immunities secured to him by the Constitution and the laws of the United States, including ... the right to be free from workplace discrimination and equal protection provided by the Fourteenth Amendment in violation of 42 U.S.C. §§ 1981 and 1983." FAC ¶ 43.

In the second cause of action, plaintiff alleges a violation of the First Amendment to the United States Constitution, against all defendants. Plaintiff asserts that he has the right under the U.S. Constitution "to support any candidate he prefers, without fear of workplace retaliation should that candidate lose the election; and that "[d]efendants' systematic harassment and creation of a hostile work environment was intended to chill [his] exercise of his First Amendment rights, and retaliate against him for exercise of those rights." FAC ¶¶ 46, 47.

In the third cause of action, plaintiff alleges a violation of the Fourteenth Amendment to the United States Constitution, against all defendants. This appears to be a Fourteenth Amendment Equal Protection claim, except that plaintiff does not mention § 1983. Plaintiff alleges that defendants' treatment of him "in a discriminatory manner is in violation of [his] fundamental constitutional rights." FAC ¶ 51.

In the fourth cause of action, plaintiff asserts a claim of "unconstitutional policy and practice," in violation of 42 U.S.C. §§ 1983, 1986, and the Fourteenth Amendment, against Contra Costa County only. Here, plaintiff alleges that the County is liable because the actions of the individual defendants were caused by customs or policies of the District Attorney's Office; were caused by deliberate indifference of the District Attorney's Office; and/or were ratified by the final decision-makers of the District Attorney's Office. FAC ¶ 54.

Defendants now seek an order dismissing the FAC pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) for failure to state a claim.

## DISCUSSION

**A. Legal Standard**

Brown v. Contra Costa County, Slip Copy (2012)

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (6) tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.,* 349 F.3d 1191, 1199–1200 (9th Cir.2003). Review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

**\*6** A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990). The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Outdoor Media Group, Inc. v. City of Beaumont,* 506 F.3d 895, 899–900 (9th Cir.2007). However, legally conclusory statements, not supported by actual factual allegations, need not be accepted. *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations and quotations omitted).

A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. *See id.* at 558–59. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679. In the event dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. *See Sparling v. Daou,* 411 F.3d 1006, 1013 (9th Cir.2005).

**B. Defendants' Motion**
Defendants argue that all four causes of action should be dismissed for failure to state a claim. Defendants first list a number of allegations in the FAC, and assert that the statements should be disregarded under *Twombly/Iqbal* because they are conclusory. The court construes this argument as part of the general argument that plaintiff has failed to plead facts sufficient to support any of the four causes of action alleged in the complaint, which is addressed below.

In general, one of the more problematic aspects of the FAC is that it sets forth a series of "Factual Allegations," and follows this section with four bare-bones causes of action, none of which clearly connects the previously alleged factual allegations to the required elements of the claims. In order to state a plausible claim, plaintiff must at a minimum indicate the facts that support each of those necessary elements.

**1. Claims of racial discrimination, harassment, and retaliation under § 1981, and equal protection violations under § 1983**
In the first cause of action, plaintiff alleges a claim of racial discrimination under 42 U.S.C. § 1981 and § 1983, against the individual defendants. In addition to discrimination, plaintiff also references racial harassment, hostile work environment, and retaliation. Defendants assert that none of the allegations are sufficient to state a claim.

**\*7** Section 1981 guarantees "all persons" the right to "make and enforce contracts." *Johnson v. Riverside Healthcare Sys., LP,* 534 F.3d 1116, 1122 (9th Cir.2008) (quoting 42 U.S.C. § 1981(a)). To state a claim of discrimination under § 1981, a plaintiff must identify an impaired "contractual relation," by showing that intentional racial discrimination prevented the creation of a contractual relationship or impaired an existing contractual relationship. *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006). Making and enforcing contracts includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Brown v. Contra Costa County, Slip Copy (2012)

In the context of employment discrimination, individuals can be personally liable under § 1981 even if the actual employer is not liable. *See, e.g., Al–Khazraji v. Saint Francis Coll.,* 784 F.2d 505, 518 (3rd Cir.1986); *El–Hakem v. BJY Inc.,* 262 F.Supp.2d 1139, 1147 (D.Or.2003), *aff'd,* 415 F.3d 1068 (9th Cir.2005). However, § 1981 covers only discriminatory conduct based on race or ethnicity. *Johnson,* 534 F.3d at 1123. Furthermore, stating a claim under § 1981 requires allegations of intentional discrimination. *Gen. Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 390–91, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

Section 1981 also encompasses employment-related retaliation claims. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 452–57, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008); *Johnson v. Lucent Techs., Inc.,* 653 F.3d 1000, 1006 (9th Cir.2011). As with Title VII and other employment-related claims, [3] plaintiff must allege facts showing that he engaged in an activity protected by the statute, and that he suffered an adverse employment action because he engaged in that activity. *See, e.g., Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1065–66 (9th Cir.2003).

Finally, in order to state a claim for workplace harassment or hostile work environment, a plaintiff must allege facts indicating that he was subjected to unwelcome verbal or physical conduct; and that the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *See, e.g., Vasquez v. County of Los Angeles,* 349 F.3d 634, 642 (9th Cir.2003); *Manatt v. Bank of America, NA.* 339 F.3d 792, 798 (9th Cir.2003); *see also Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (conduct must be sufficiently severe or pervasive in order to create an objectively hostile or abusive work environment); *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (verbal comment or physical conduct must affect the terms, conditions, or privileges of employment).

In addition, occasional or isolated incidents are not actionable, and a plaintiff must show a concerted pattern of harassment of a repeated, routine, or generalized nature. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In his opposition, plaintiff appears to be asserting that the harassment claim is valid on a "continuing violation" theory. In the Ninth Circuit, the continuing violations doctrine applies to claims pursuant to 42 U.S.C. sections 1981 and 1983 in the same manner as the doctrine applies to claims pursuant to Title VII—the doctrine is applicable to hostile work environment claims involving related acts that collectively constitute a single unlawful employment practice, but inapplicable to claims for discrete acts of discrimination and retaliation. *Leland v. City & County of San Francisco,* 576 F.Supp.2d 1079, 1093 (N.D.Cal.2008) (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

**\*8** Here, however, because of the deficiencies in the pleading, it is not clear whether the continuing violations doctrine can save plaintiff's claims, given that he alleges incidents that occurred as many as ten years ago. Because the FAC does not connect any facts to the elements required to state a claim under theories of discrimination, retaliation, and harassment, it is difficult to determine the basis for the § 1981 claims. In addition, there are no facts pled that show defendants were motivated by any racial animus, apart from the vague and conclusory allegations regarding the "undercurrent of racism in the criminal justice system." FAC ¶ 15. Accordingly, the motion is GRANTED as to the § 1981 claims. The dismissal is with leave to amend to allege facts sufficient to support the elements of the claims.

Finally, with regard to the § 1983 claim for violation of the Equal Protection Clause, this claim appears indistinguishable from the third cause of action, discussed below. Accordingly, the court treats the first cause of action as alleging only a § 1981 claim, and analyzes the sufficiency of the § 1983 allegations in its discussion of the third cause of action.

## 2. First Amendment claim

In the second cause of action, plaintiff alleges that his "demotion" to the Mental Health Unit and transfer to the Juvenile Unit by Peterson violated his First Amendment rights, because Peterson took those actions in retaliation for plaintiff's having supported another candidate in the election for District Attorney.

Brown v. Contra Costa County, Slip Copy (2012)

Under *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a public official who is a "policymaker" can be fired for political reasons without offending the United States Constitution. While there is not a clear line between policymaking and non-policymaking positions, part of the consideration involves whether the employee "acts as an advisor or formulates plans for implementation of broad goals." *Id.* at 368. The question whether an individual is a policymaker is a question of law for the court. *Hobler v. Brueher,* 325 F.3d 1145, 1151 (9th Cir.2003).

If the court determines that the employee is in a policymaking position, that disposes of any First Amendment retaliation claim. *Biggs v. Best, Best & Krieger,* 189 F.3d 989, 994–95 (9th Cir.1999). A policymaker holds his/her office at the will of the employer, and may be demoted by reason of political activity; thus, the First Amendment does not bar adverse employment action based solely on the content of a policymaker's expressive activities or beliefs. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 74, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court found that the ultimate inquiry is not whether the label "policymaker" fits a particular position, but "whether the hiring authority can demonstrate that the party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518. The Court concluded that the employment of an assistant public defender cannot be conditioned on the employee's allegiance to the political party or the control of the county government. *Id.* at 519.

**\*9** Although the *Branti* Court specifically declined to decide whether the same rule would apply to a deputy district attorney, it did note the distinction between an assistant public defender, who acts more like a private attorney for criminal defendants, and a deputy district attorney, who represents the state as a prosecutor. *Id.* at 519. Later, in *Fazio v. City and County of San Francisco,* 125 F.3d 1328 (9th Cir.1997), the Ninth Circuit held that an assistant district attorney who was fired by the District Attorney for political reasons was a "policymaker" and therefore could not state a First Amendment claim based on his firing.

In this case, defendants assert that plaintiff meets the definition of "policymaker," based on the allegations in the FAC that from 2004 to January 2011, plaintiff held the position of Senior Deputy District Attorney in charge of the Richmond branch of the D.A.'s Office—a job that required a combination of management skills, legal expertise, and the ability to interact with the judiciary, local police agencies, the community, and the press. FAC ¶ 14. In addition, defendants note, plaintiff alleges that he had ascended to "the top ranks of the District Attorney's Office." FAC ¶ 15. Defendants contend that this description necessarily indicates that plaintiff was a policymaker, and that even after he was transferred to the Mental Health Unit, plaintiff was "straightening out the legal mess ... left behind" and also began trying cases—"a rarity for this unit." FAC ¶ 28.

The court finds that the motion must be GRANTED. Plaintiff cannot state a First Amendment claim under the facts alleged in the FAC, as a matter of law. Based on the allegations in the FAC, he was clearly in a "policymaking" position, and Peterson was entitled, after the election, to reassign employees into policymaking positions as he wished. Plaintiff cannot maintain a First Amendment claim based simply on the fact that a newly elected District Attorney opted to place his own people around him, and to move plaintiff to another unit within the D.A.'s Office.

### 3. Fourteenth Amendment claim

In the third cause of action, plaintiff alleges a claim of violation of the Equal Protection Clause of the Fourteenth Amendment, against all defendants. The Fourteenth Amendment is not self-executing, and can only be brought by plaintiff pursuant to a § 1983 claim. *Magana v. Com. of the Northern Mariana Islands,* 107 F.3d 1436, 1441–42 (9th Cir.1997) (Congress did not intend Fourteenth Amendment to be "self-enforcing," and § 1983 is the "modern-day statute 'to enforce the Provisions of the Fourteenth Amendment to the Constitution' "); *see also Ngiraingas v. Sanchez,* 495 U.S. 182, 187, 110 S.Ct. 1737, 109 L.Ed.2d 163 (1990) (section 1983 was originally enacted as § 1 of the Civil Rights Act of 1871, the purpose of which was to enforce the provisions of the Fourteenth Amendment)). Accordingly, the court construes this as an equal protection claim under § 1983.

**\*10** To state a claim under § 1983, a plaintiff must allege two essential elements: 1) that a right secured by the Constitution or laws of the United States was violated, and 2) that the alleged violation was committed by a person acting under the color

Brown v. Contra Costa County, Slip Copy (2012)

of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Here, plaintiff alleges that defendants violated his right to be free from workplace discrimination and his right to equal protection under the Fourteenth Amendment to the United States Constitution.

Defendants argue that the equal protection claim should be dismissed because plaintiff alleges no facts showing intentional discrimination by the defendants or that race motivated any of their alleged wrongful acts.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citation omitted); *Thornton v. City of St. Helens,* 425 F.3d 1158, 1168 (9th Cir.2005) (evidence of different treatment of unlike groups does not support an equal protection claim).

To state a claim under § 1983 for an equal protection violation, a plaintiff must allege facts showing that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class, and that plaintiff was treated differently from persons similarly situated. *See Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998); *see also Washington v. Davis,* 426 U.S. 229, 239–40, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Serrano v. Francis,* 345 F.3d 1071, 1081–82 (9th Cir.2003); *Lee v. City of Los Angeles,* 250 F.3d 668 (9th Cir.2001).

A plaintiff may satisfy this standard by alleging (1) that he/she was treated differently from others similarly situated; (2) that this unequal treatment was based on an impermissible classification; (3) that the defendant acted with discriminatory intent in applying this classification; and (4) that he/she suffered injury as a result of the discriminatory classification. *See, e.g., Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *see also Lam v. City and County of San Francisco,* ——F.Supp.2d ——, 2012 WL 1253199 at *20 (N.D.Cal. April 13, 2012).[4]

The court finds that the motion must be GRANTED. Plaintiff in the present case appears to be basing his equal protection claim on both discrimination and harassment. For the reasons stated above with regard to the first cause of action, however, it is not clear which facts are intended to support which claim. And as to the facts that are alleged, there are none that support an inference of intentional discrimination or harassment based on race.

In addition, as explained above, a harassment claim must allege that the harassment affected the conditions of plaintiff's employment—that is, that it was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment. Here, however, plaintiff has failed to plead facts showing that he suffered from racial harassment, or that the harassment was sufficiently severe or pervasive so as to alter the conditions of employment.

### 4. *Monell* claim

*11 In the fourth cause of action, plaintiff alleges a claim of "unconstitutional policy and practice" under 42 U.S.C. §§ 1983 and 1986, and the Fourteenth Amendment, against Contra Costa County, pursuant to *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

As an initial matter, the court notes that a claim can be stated under § 1986 only if the complaint states a claim under 42 U.S.C. § 1985. *See Karim-Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 626 (9th Cir.1988). Accordingly, as no § 1985 claim is stated in the FAC, the § 1986 claim must be dismissed. In addition, the court notes, as explained above, that any Fourteenth Amendment claim must be brought under § 1983.

As for the § 1983 claim, defendants contend that plaintiff has failed to allege facts sufficient to state a claim against a municipality. In addition, defendants assert, municipal liability is dependent on a violation of constitutional rights, and without

Brown v. Contra Costa County, Slip Copy (2012)

an underlying constitutional violation, there can be no municipal liability. Here, defendants argue, because none of the defendants violated plaintiff's federally protected constitutional rights, the County cannot be liable under § 1983.

Local governments are "persons" subject to suit for constitutional violations under § 1983. *See Monell,* 436 U.S. at 691. However, local governments can only be sued where the claims arise out of unconstitutional actions by their employees who implement or execute a "policy statement, ordinance, or decision officially adopted and promulgated by that body's officers ...." *Id.* at 690–91. That is, a public entity "cannot be held liable solely because it employs a tortfeasor." *Id.* at 691.

A *Monell* claim for section 1983 liability against a public entity may be stated in one of three circumstances—(1) when official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of "deliberate indifference" to constitutional rights; or (3) when a local government official with final policy-making authority ratifies a subordinate's unconstitutional conduct. *Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1249–50 (9th Cir.2010) (synthesizing Supreme Court authorities); *Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir.1995). These limitations also apply under § 1981. *Fed'n of African American Contractors v. City of Oakland,* 96 F.3d 1204, 1214–15 (9th Cir.1996).

Here, plaintiff has failed to state a claim against the County under this standard. He alleges that the actions of the individual defendants (1) were caused by customs or practices of the District Attorney's Office; (2) were caused by deliberate indifference of the District Attorney's Office; and/or (3) were ratified by final decision-makers of the District Attorney's Office." FAC ¶ 53. However, he has alleged no facts showing any alleged discriminatory or retaliatory conduct that stemmed from official policy or custom.

  **\*12** Prior to *Iqbal* and *Twombly,* the long-standing rule was that a plaintiff need only make "a bare allegation that the individual [defendants'] conduct conformed to official policy, custom, or practice." *Karim—Panahi,* 839 F.2d 621, 623 (9th Cir.1988). Indeed, the Supreme Court rejected a heightened pleading standard for *Monell* claims in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). While neither Iqbal nor *Twombly* overruled *Leatherman,* the pleading standard for *Monell* claims has been thrown into question, and, in the Ninth Circuit at least, appears to have been modified.

In *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 2101, 182 L.Ed.2d 882 (2012), the Ninth Circuit considered the impact of *Iqbal* and *Twombly,* and concluded that a pleading of municipal liability "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and that the facts must "plausibly suggest an entitlement to relief." *Id.* at 1216 (citations omitted); *see also AE ex rel. Hernandez v. County of Tulare,* 666 F.3d 631, 636–38 (9th Cir.2012) (noting impact of recent Supreme Court decisions, including *Twombly/Iqbal,* on pleading standards, and applying Starr to municipal liability claims, holding that "plausible facts supporting a policy or custom ... could ... cure[ ] the deficiency in [a] Monell claim").

Here, the court finds that while the FAC alleges all three bases for *Monell* liability, it asserts legal conclusions only. That is, there are no facts pled in support of any of these theories of liability. Accordingly, the motion to dismiss must be GRANTED with leave to amend to allege facts sufficient to state a claim against the County under §§ 1981 and 1983.


## CONCLUSION

In accordance with the foregoing, the court GRANTS the motion. The second cause of action alleging retaliation in violation of the First Amendment is dismissed with prejudice. The remaining claims are dismissed with leave to amend.

An amended complaint shall be filed no later than November 9, 2012. Plaintiff shall add no new parties or causes of action unless he first seeks leave of court.

Brown v. Contra Costa County, Slip Copy (2012)

**IT IS SO ORDERED.**

Footnotes

| | |
|---|---|
| 1 | The court assumes that plaintiff intended to say "December 2010." |
| 2 | Plaintiff also alleges, however, that he had filed an administrative charge with the EEOC in September 2011. *See* FAC ¶ 40. |
| 3 | The analysis of a § 1981 employment discrimination claim follows the same legal principles as a Title VII racial discrimination claim. *Metoyer v. Chassman,* 504 F.3d 919, 930 (9th Cir.2007). |
| 4 | Claims of workplace retaliation are outside of the scope of equal protection under the Fourteenth Amendment. *See Sizemore v. City of Dallas,* 443 F.Supp.2d 1201, 1204–05 (D.Or.2009) (holding, based on reasoning in decisions from the First, Second, Sixth, Seventh, and Tenth Circuits, that the plaintiff was precluded from bringing an employment-related retaliation claim under 42 U.S.C. § 1983 for an alleged equal protection violation). |

End of Document                                                   © 2012 Thomson Reuters. No claim to original U.S. Government Works.