UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Lance Goode,<br>　　　*Plaintiff*,<br><br>　　　*v.*<br><br>Roger G. Newton, Jr., et al.,<br>　　　*Defendants*. | Civil No. 3:12cv754 (JBA)<br><br>March 14, 2013 |

**RULING ON MOTIONS TO DISMISS**

Plaintiff Lance Goode brings a nine-count complaint against the City of New London (the "City") and a number of New London police officers for violating his federal and state constitutional rights. Plaintiff alleges that he was falsely arrested on two occasions, and that, on one of those occasions, Defendants used excessive force when they arrested him. Pending before the Court are two motions to dismiss. Officer Todd Lynch moves [Doc. # 26] to dismiss the amended complaint as against him, arguing that, for the purposes of 42 U.S.C. § 1983, he was not personally involved in any of the alleged constitutional violations. The remaining Defendants ("City Defendants"), with the exception of Officer Newton, separately move [Doc. # 48] to dismiss Plaintiff's *Monell* claims and to narrow Plaintiff's claims under the state constitution. For the reasons stated below, both motions will be granted in part and denied in part.

**I.　　Factual Background**

The following facts are culled from Plaintiff's Amended Complaint [Doc. # 45]. Plaintiff alleges two separate occasions when Defendants violated his civil rights, one on April 29, 2010 and the other on October 20, 2010.

A.      **April 29, 2010 Incident**

On or about April 29, 2010, Officer Todd Lynch, a member of the New London police department, misrepresented to the New London Housing Authority ("NLHA") that Plaintiff had been belligerent to tenants at 202 Coleman Street (the "premises"), a public housing facility where Plaintiff's mother lived at the time. Officer Lynch's misrepresentations caused the NLHA to issue a "no trespassing" letter against Plaintiff, of which he had no notice. (Am. Compl. [Doc. # 45] ¶ V.5-6.)[1]

Officer Lynch posted the NLHA's "no trespassing" letter at the premises. That same day—late in the evening—someone purportedly tipped off the police that Plaintiff was present at the premises at 4:00 a.m., in violation of the just-posted letter. Police officers were dispatched to investigate the alleged trespass—a nonviolent criminal misdemeanor—including Officers Wayne Neff, Lawrence Keating, David McElroy, and Kyle Gorra. (*Id.* ¶¶ V.7-8.) A policeman saw Plaintiff in the vicinity of the building and pursued him on foot. (*Id.* ¶ V.9.) Plaintiff entered a friend's house, where he was welcome, and sat down in his friend's chair. (*Id.* ¶ V.10.) Officers Neff, McElroy, and Gorra entered the home without warrant or invitation, and, after Plaintiff refused to stand up, Officer Neff summoned Officer Keating to subdue Plaintiff with a taser, even though Plaintiff was unarmed and peaceful. (*Id.* ¶¶ V.11-13.) After Plaintiff refused to stand up for a second time, Officer Keating tasered him twice, and all of the Officers who were present inside the home assaulted him, smashing his head on a wall, handcuffing

---

[1] The numbering of the paragraphs in the Amended Complaint restarts with each count. The Court uses roman numerals to designate the count where the cited paragraph can be found. For example, the citation preceding this footnote references Paragraphs 5 and 6 of Count V.

him, and slamming him on the ground with enough force to break his elbow, as confirmed by subsequent x-rays. (*Id.* ¶¶ V.13-15.)

In connection with these events, Plaintiff was arrested and charged with criminal trespass, interfering with an officer, assault on a police officer, and possession of narcotics. (*Id.* ¶ V.16)  The NLHA later rescinded its "no trespassing" letter because Plaintiff had not, in fact, been belligerent toward any tenants of 202 Coleman Street.  All of the charges against Plaintiff were nolled, with the prosecutor stating that if the NLHA "had all of the information, they would not have issued the original ['no trespassing'] letter that was issued, and . . . they have . . . revoked that." (*Id.* ¶ V.21.)

### B. October 20, 2010 Incident

Officer Roger Newton, who is white, served as a New London police during all times relevant to this action. (*Id.* ¶¶ I.2-3.)  On October 20, 2010 while on uniformed patrol in his police car, Officer Newton began to follow, without cause, Plaintiff, who is black, as he drove through New London in his Honda Accord. (*Id.* ¶¶ I.1, I.5.) When Plaintiff parked in the driveway of a private residence, Officer Newton parked next to Plaintiff, approached him, and asked for his license and registration. (*Id.* ¶ I.5.)

Shortly thereafter, Officer Henderson arrived as backup. His car was parked at an angle such that Plaintiff's car was within view of the video camera that was mounted on the dashboard of Officer Henderson's car. (*Id.* ¶ I.6)  This video camera captured Officer Newton planting drugs near Plaintiff's car. Specifically, when Officer Henderson and Plaintiff went inside the residence so that Plaintiff could get his car insurance information, Officer Newton dropped a bag of oxycodone, and then kicked the bag near the right front door of Plaintiff's car. (*Id.* ¶¶ I.9-11.) Officer Newton then lied in his police report and said that when he opened the glove compartment, a bag of drugs fell out. (*Id.*

¶¶ I.11-15.) Based on Officer Newton's lies, Plaintiff was arrested and charged with three felonies, which together carried a minimum sentence of five years' imprisonment. (*Id.* ¶ I.16-17.)

Plaintiff suffered significant harm as a result of Officer Newton's planting drugs outside Plaintiff's vehicle and lying in his police report. On the day he was arrested, Plaintiff was handcuffed and held in custody. (*Id.* ¶ I.20.) When he was arrested six months afterward on an unrelated charge, the October 20 arrest caused Plaintiff's bond to be set so high that he was unable to pay it, causing him to spend fifty-six days in prison. (*Id.* ¶ I.21.) All charges against Plaintiff were dropped when Defendant's counsel obtained the video from Officer Newton's dashboard that clearly indicated there was no lawful reason for the traffic stop.

In early 2012, Officer Newton was suspended from the New London police force and then retired, in exchange for the City and the Police Department ceasing the internal investigation into his misbehavior on the job. (*Id.* ¶¶ I.25-26.)

### C.  Other Incidents Involving New London Police

In addition to pleading the above facts, Plaintiff also includes in his Amended Complaint allegations from other pending lawsuits against New London police officers, to bolster his *Monell* claims in Count Four and Count Six by establishing that the New London police department had a policy or custom in place which violated his constitutional rights.

Count Four alleges that the City is liable for Officer Newton's actions on October 20, 2010. Plaintiff identifies two incidents that, in his estimation, demonstrate the requisite municipal policy: (1) the Reuben Miller incident; and (2) the false arrest of Francisco Francovilla. (*Id.* ¶ IV.32(a-b).) Neither incident involves any of the Defendant

officers in this case. The Miller incident, which took place on December 14, 2011—over a year after the Officer Newton incident—involves allegations that officers lacked probable cause to make an arrest, and that officers used excessive force. The Francovilla incident, which forms the basis of a suit currently before Judge Underhill, took place on July 9, 2009. (*Id.* ¶ IV.32(b).) The Francovilla allegations include assertions that City officers filed false police reports and charges. (*See id.*)

Count Six asserts that the City is responsible for the constitutional violations perpetrated by Officers Lynch, Neff, Keating, McElroy, and Gorra on April 29, 2010. Plaintiff realleges the Miller and Francovilla incidents (*see id.* ¶¶ VI.26(a, d)) and recounts two additional instances of alleged misconduct by New London officers: (1) the Cunningham incident and (2) an incident involving Donald and Andre Gilbert. (*See id.* ¶¶ VI.26(c, h-i)). As with the allegations regarding Reuben Miller, both of these incidents occurred over a year after the allegations in Count Six, and none involve Officers Lynch, Keating, McElroy, Neff or Gorra. On August 24, 2011, a New London officer allegedly used excessive force by shooting Mr. Cunningham. (*See id.* ¶ VI.26(c).) On October 25, 2011, Officer Newton allegedly stopped a car containing Donald and Andre Gilbert and used excessive force when frisking them and then effected a pretextual arrest. (*See id.* ¶ VI.26(c).)

II.   Discussion[2]

    A.   Officer Lynch's Motion to Dismiss [Doc. # 26]

Officer Lynch is named in three counts, all relating to his alleged participation in the April 2010 arrest: Count Five, which alleges violations of 42 U.S.C. § 1983; Count Seven, which asserts common law false arrest and malicious prosecution; and Count Eight, which alleges violations of the Connecticut constitution. Officer Lynch urges the Court to dismiss all three counts as against him.

        1.   *Count Five: § 1983 (False Arrest)*

Plaintiff concedes in his opposition brief that Officer Lynch is not liable for the use of excessive force in April 2010. (*See* Pl.'s Opp'n [Doc. # 35] at 5 (stating that Lynch's "1983 Count Five liability is limited to causing the plaintiff's false arrest for misdemeanor trespass").)  The only question for the Court is whether Plaintiff has stated a plausible false arrest claim under § 1983.

False arrest claims under § 1983 are "substantially the same as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks omitted). Under Connecticut law, "false imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Green v. Donroe*, 186 Conn. 265, 267 (1982). To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff is required to show that "the defendant

---

[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations will not suffice. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

intentionally confined him without his consent and without justification." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quotation marks omitted). A false arrest claim will fail if the defendant-officer had probable cause to arrest the plaintiff. *See, e.g.*, *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (noting that probable cause is "a complete defense to an action for false arrest").

Officer Lynch first argues that Plaintiff's § 1983 false arrest claim fails because Officer Lynch did not "effect the deprivation of plaintiff's physical liberty" (Def.'s Mem. Supp. [Doc. # 26-1] at 6.) Noting that he was not present when Plaintiff was arrested on April 29, 2010, Officer Lynch argues that his only involvement was obtaining the "no trespassing" letter, and that obtaining the letter was not, by itself, a deprivation of liberty. On this point, Officer Lynch cites *Burg v. Gosselin*, 591 F.3d 95, 98 (2d Cir. 2010), which held that the "issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." *See also Hary v. Dolan*, 3:08-cv-1611(JCH), 2010 WL 419404, at *3-4 (D. Conn. Jan. 29, 2010) (holding that the issuance of a motor vehicle infraction, without more, does not constitute an arrest); *Tombardi v. Quinones*, 3:98CV01921 AVC, 2000 WL 852431, at *5-6 (D. Conn. Mar. 31, 2000) (concluding that issuance of a citation was not an arrest). While Officer Lynch is correct that merely obtaining the "no trespassing" letter was not itself a Fourth Amendment seizure, this common-sense proposition is insufficient to dismiss Count Five, because Plaintiff has alleged that Officer Lynch's actions *caused* Plaintiff to be arrested. (*See* An. Compl. ¶ V.19.)  Unlike *Burg*, *Hary*, and *Tombardi*— none of which involved *actual* arrests—Plaintiff alleges that he was handcuffed, told that he was under arrest, and charged with a criminal trespass misdemeanor.  (*See id.* ¶¶ V.13, 16, 19, 20.)

The key question, then, is whether obtaining the "no trespassing" letter and posting it on the premises, together, constitute enough personal involvement for Officer Lynch to be liable under § 1983 for Plaintiff's April 2010 arrest. *See McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages."). Observing that Plaintiff does not claim that Officer Lynch was a supervisor, Officer Lynch argues, without offering accompanying legal support, that he was not personally involved in the ultimate arrest and that, as such, he cannot be liable under § 1983. (Def.'s Mem. Supp. at 10.)  This argument is unavailing as Officer Lynch need not have actually applied Plaintiff's handcuffs—nor even have been present at the time of arrest—to be personally involved in his false arrest for criminal trespass. As the Supreme Court observed,

> section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link.

*Malley v. Briggs*, 475 U.S. 335, 345 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). Thus, as long as the causal link is strong enough, "[a]s a general rule, a government official's liability for causing an arrest is the same as for carrying it out." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) (citing *Kilbourn v. Thompson*, 103 U.S. 168, 200 (1880)); *accord Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994). For example, in *Thompson v. Wagner*, 631 F. Supp. 2d 664 (W.D. Pa. 2008), the district court found that two detectives who submitted an affidavit in support of an arrest warrant, but who were not present at the scene of the arrest, could nevertheless be held liable for false arrest if a jury found that the detectives had purposefully lied in their affidavit. *Id.* at 672-73, 681, 683.

Here, the Amended Complaint contains sufficient facts to establish a plausible claim that Officer Lynch caused Plaintiff to be falsely arrested for criminal trespassing. Officer Lynch made affirmative misrepresentations to the NLHA in order to obtain a "no trespassing" letter, which was later rescinded by the NLHA as groundless. Moreover, Officer Lynch posted the "no trespassing" letter on the premises shortly before Plaintiff was arrested, without giving Plaintiff independent notice. These allegations alone create a plausible inference that Officer Lynch made misrepresentations to create a pretext for arresting Plaintiff. In short, it is plausible that Officer Lynch caused—and was thus personally involved in—Plaintiff's false arrest for criminal trespassing. *See Wagner*, 631 F. Supp. 2d at 672-73, 683.

2. *Count Seven: Common Law False Arrest & Malicious Prosecution*

Count Seven alleges both common law false arrest and malicious prosecution claims. Officer Lynch argues that both claims fail as a matter of law. The Court disagrees.

To succeed on his malicious prosecution claim, Plaintiff must establish "(1) the defendant initiated or procured the institution of criminal proceedings against him; (2) the criminal proceedings have terminated in the plaintiff's favor; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Karwowsky v. Fardy*, 118 Conn. App. 480, 486 (2009). Officer Lynch argues that the common law malicious prosecution claim fails on prong (1)—that is, that Officer Lynch did not initiate or procure a criminal proceeding against him. (*See* Def.'s Mem. Supp. at 12.) Officer Lynch offers no legal support for why Officer Lynch's obtaining the "no trespassing" letter did not itself initiate or procure the initiation of the Plaintiff's prosecution. Even if the letter did not satisfy the first element of Plaintiff's malicious prosecution claim, the Court finds that is plausible

9

that Officer Lynch "initiated or procured" the institution of the criminal trespass proceedings, based on Plaintiff's allegations that Officer Lynch made misrepresentations to the NLHA to obtain the "no trespassing" letter (*see* Am. Compl. ¶¶ V.5-6) and that Plaintiff was charged criminal trespass (*see id.* ¶ V.16). The Court can reasonably infer from these two allegations that it is plausible that Officer Lynch was not truthful to whichever state official charged Plaintiff with criminal trespass. *See Bhatia v. Debek*, 287 Conn. 397, 408 (2008) (noting that the first malicious-prosecution element is satisfied when a defendant knowingly provides false information to a public officer).

The only reasoning that Officer Lynch provides with respect to the common law false arrest claim is that, because the § 1983 false arrest claim fails, so too does the common law variant. (*See* Def.'s Mem. at 10-11 ("Based on all the foregoing [analysis regarding § 1983], Officer Lynch . . . requests that the Court dismiss the plaintiff's false arrest claims pursuant to 42 U.S.C. § 1983, the Connecticut common law, and Article First, Sections 7 and 9 of Constitution of the State of Connecticut as directed at him.").) Inasmuch as Plaintiff has stated a plausible § 1983 false arrest claim, and in light of the fact that Officer Lynch offers no independent reasons why the common law false arrest claim should be dismissed, Officer Lynch's motion to dismiss is denied as to Count Seven.

       3.     *Count Eight: Connecticut Constitution*

In Count Eight, Plaintiff brings claims under Article First, Sections 4, 7, 9, and 20. However, at oral argument and in his opposition brief to the City Defendants' motion to dismiss (*see* Pl.'s Opp'n [Doc. # 51] at 21), Plaintiff concedes that there is no private right of action for money damages under Sections 4 and 20 of Article First of the Connecticut Constitution. Accordingly, the Court dismisses the portion of Count Eight alleging claims under Article First, Sections 4 and 20.

10

Officer Lynch argues that the remaining state constitutional claims fail because the purported defects in Plaintiff's § 1983 false arrest claims also compel the Court to dismiss the claims under the state constitution. (*See* Def.'s Mem. Supp. at 12-13 ("The plaintiff's false arrest claims under Sections 7 and 9 must fail for the reasons stated *supra*, at 5-10.").) This argument is insufficient, in light of the fact that Plaintiff has pleaded a valid § 1983 false arrest claim, and inasmuch as Officer Lynch has not established that claims brought under the Connecticut Constitution present a more stringent pleading standard.  The Court therefore limits Count Eight to the claim that Officer Lynch violated Article First, Sections 7 and 9 of the Connecticut Constitution.

### B. City Defendants' Motion to Dismiss [Doc. # 48]

The City Defendants move to dismiss Counts Four, Six, Eight and Nine of Plaintiff's Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

#### 1. *Counts Four and Six:* Monell *Claims*

Plaintiff brings *Monell* claims in Counts Four and Six, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), premised on the City's alleged failure to supervise and failure to train its police officers. City Defendants argue that Plaintiff's *Monell* claims fail because Plaintiff has not pled adequate facts to establish that the City had a municipal policy that caused the deprivations of rights alleged in the Amended Complaint.

Section 1983 does not provide for *respondeat superior* liability.  *See id.* at 691. Beyond simply alleging that the City employed tortfeasors on its police force, Plaintiff must allege that his constitutional injuries were caused by actions taken "pursuant to official municipal policy." In *Monell*, municipal liability was premised on the City's affirmative conduct, but municipal nonfeasance can qualify as a policy or practice that

11

renders a municipality liable: "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  Plaintiff argues that the City is liable for its nonfeasance under two distinct, albeit related, theories: failure to train and failure to supervise.

Under either a failure-to-train or failure-to-supervise theory, a municipality is liable only where the inadequate training or supervision amounts to "deliberate indifference to the rights of person with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("Although *City of Canton* addressed a claim of a failure to train, the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims [including failure to supervise]."). From this deliberate-indifference requirement, the Second Circuit has established three requirements: (1) "the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation," (2) "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation," and (3) "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992); *see also Reynolds*, 506 F.3d at 193.  Finally, Plaintiff ultimately must prove not only that the deficiencies in the City's training or supervision constituted "deliberate indifference," but also that a causal connection exists

between the inadequacies in the training or supervision and Plaintiff's constitutional violations. *See City of Canton*, 489 U.S. at 391.

While the parties largely agree on the ultimate requirements under *Monell*, they disagree about the nature of the pleading standard for *Monell* claims on a Rule 12(b)(6) motion. Plaintiff argues that the proper standard for pleading a *Monell* claim is articulated in *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993), which, according to Plaintiff, makes clear that a *Monell* claim can survive on conclusory allegations, so long as the pleading gives fair notice to Defendants. (*See* Pl.'s Opp'n [Doc. # 51] at 4-12.) Plaintiff claims that *Leatherman* remains good law, notwithstanding the Supreme Court's decisions in *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662. *Leatherman* does not, however, represent a substantive carve-out for *Monell* claims, but rather stands for the proposition that courts may not impose a more rigorous pleading standard to *Monell* claims. *See Leatherman*, 507 U.S. at 168-69. To survive a motion to dismiss, a *Monell* claim must include enough factual material to be plausible. *See Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) ("Following *Iqbal* and *Twombly*, *Monell* claims must satisfy the plausibility standard . . . ."). That said, in evaluating the plausibility of *Monell* claims, courts are mindful of the Second Circuit's observation that "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004); *see Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 45 (E.D.N.Y. 2011); *Castilla v. City of New York*, 09 Civ. 5446 (SHS), at 7 (S.D.N.Y. Sept. 6, 2012) (unpublished).

The question, then, is whether the nonconclusory allegations in the Amended Complaint are sufficient to render the *Monell* claims plausible. The Court recognizes that

13

this presents a close question, but concludes that Plaintiff has pled sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" of inadequate training or supervision, *see Twombly*, 550 U.S. at 556. First, the Court notes that Plaintiff alleges two separate violations—six months' apart—committed by New London officers, which share a common thread: manufactured criminality. According to the Amended Complaint, Officer Newton planted drugs and falsified his police report, and Officer Lynch lied to obtain a "no trespassing" letter from the NLHA that then served as the basis for a pretextual arrest. Second, notwithstanding Defendants' characterization of the Francovilla incident as "completely unrelated" to this suit (Defs.' Mem. Supp. at 11), the Francovilla matter involves allegations that New London policemen falsified police reports and manufactured criminal charges in 2009 (*see* Am. Compl. ¶ IV.32(b)).[3] Third, as Plaintiff notes, the New London police force is relatively small, consisting of approximately eighty sworn officers. (*See* Pl.'s Opp'n [Doc. # 51] at 20.) In light of the small size of the police force, the prior allegations of falsifying police reports in 2009, and the continued practice of falsifying reports in 2010, the Court finds that it is plausible that Defendants had an informal custom of "tolerating police misconduct" and that this custom caused the violations alleged in Counts Four and Six. *See Castilla*, 09 Civ. 5446 (SHS), at 8 (quoting *Michael v. County of Nassau*, 09-CV-5200 JS AKT, 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010)). Accordingly, the City Defendants' motion to dismiss is denied as to the *Monell* counts.

---

[3] While Defendants note that Mr. Fracovilla did not bring suit until 2011 (*see* Defs.' Opp'n [Doc. # 49] at 14 n.2), the Court can reasonably infer that the City had notice of the purported wrongdoing well before the formal complaint was filed.

### 2. *Counts Eight and Nine: Connecticut Constitution*

As stated with respect to Officer Lynch's motion, Plaintiff has conceded that no private right of action exists for money damages under Sections 4 and 20 of Article First of the Connecticut Constitution. Accordingly, the City Defendants' motion is granted inasmuch as it seeks to dismiss the portion of Counts Eight and Nine brought under Article First, Sections 4 and 20 of the Connecticut Constitution.

### 3. *Count Nine: Connecticut Constitution Against City*

In Count Nine, Plaintiff sues the City under the Sections 4, 7, 9, and 20 of Article First of the Connecticut Constitution. The City Defendants contend that this Count fails because there is "no authority that expressly authorizes such a cause of action under Connecticut law" and because, even if municipal liability exists under Sections 7 and 9, a plaintiff must establish the same basic elements as a *Monell* claim. (Defs.' Mem. at 10.)

In *Binette v. Sabo*, 244 Conn. 23, 25-26 (1998), the Connecticut Supreme Court held that "the Connecticut constitution gives rise to a private cause of action for money damages stemming from alleged violations of article first, §§ 7 and 9 of our state constitution." While *Binette* clearly provides that individual defendants may be liable for violating an individual's rights under the state constitution, it remains an open question whether a *municipality* can be liable, and, if so, on the basis of what legal standard. As observed in *Morales v. Town of Glastonbury*, 3:09-CV-713 (JCH), 2012 WL 124582, at *11 (D. Conn. Jan. 17, 2012), "[t]he court cannot locate any authority in the Connecticut case law recognizing municipal liability for violations of sections seven or nine of Article First of the Connecticut Constitution." Following the approach taken by a prior case in the District, *Seri v. Town of Newtown*, 573 F. Supp. 2d 661 (D. Conn. 2008), the *Morales* court concluded that the standards under *Binette* are at least as stringent as the standards under

*Monell*, and that, because the plaintiff had not established *Monell* liability, the plaintiff's municipal claims under the state constitution failed as well. *See Morales*, 2012 WL 124582, at *11; *see also Seri*, 573 F. Supp. 2d at 670 (concluding that the court "need not reach the question whether the Connecticut courts would recognize a similar claim against municipalities for violations of the Connecticut Constitution because that claim would also fail for [the same reasons that the plaintiff's *Monell* claim failed]."). Here, however, the Court has determined that Plaintiff has adequately pled his *Monell* claims, and the Court thus cannot dismiss the Count Nine on the ground identified in *Morales* and *Seri*.

As the City Defendants have not put forward any legal basis that Connecticut law bars municipal liability under *Binette*, their motion to dismiss is denied as to Count Nine.

### III.    Conclusion

For the reasons stated above, Officer Lynch's Motion to Dismiss [Doc. # 26] and the City Defendants' Motion to Dismiss [Doc. # 48] are GRANTED in part and DENIED in part. Counts Eight and Nine are limited to claims under Article First, Section 7 and 9 of the Connecticut Constitution. In all other respects, both motions to dismiss are denied.

IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of March, 2013.